**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:14-CR-119 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| ROBERT J. RICE, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

The court sentenced defendant Robert J. Rice to 142 months' imprisonment after a jury found him guilty of possessing and distributing child pornography. He now moves to vacate his sentence pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. We will deny Rice's motion.

## I. Factual and Procedural History[1]

### A. Rice's Marriage and Pornography Addiction

Rice met Marilyn Goldie while stationed in southern England in 2003. (See Doc. 95, 5/2/16 Trial Tr. 127:13-16). He was a colonel in the United States Army completing the final leg of a three-year exchange officer program; she was a civil servant with the Royal Artillery, a division of the British Army. (See id. at 127:17-

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the weeklong trial and two-day evidentiary hearing in this matter, together with the parties' briefing. Citations to the transcripts of the trial held from May 2 through May 6, 2016, are abbreviated as "[Date] Trial Tr. ___," and citations to the April 30 and May 14, 2021 evidentiary hearing on Rice's pending motion are abbreviated as "[Date] Hr'g Tr. ___." Exhibits are cited as "Gov't Ex. __" and "Def. Ex. __."

20).  They wed in the United Kingdom the same year and moved to the United States that August.  (See id. at 127:21-128:2).  Both had children from previous marriages: Rice had three sons, one of whom lived with him, and Rice-Goldie had two daughters who came with her to America.  (See id. at 129:2-8).  The couple relocated frequently during the early part of their marriage due to Rice's military assignments, including two-year posts in Oklahoma and Italy; at least one year at Carlisle Barracks in Pennsylvania, the site of the United States Army War College; and another multiyear stint in Hawaii in 2009 and 2010, which coincided with Rice's tours of duty in Kuwait, Iraq, and Afghanistan.  (See id. at 128:3-15; Doc. 97, 5/4/16 Trial Tr. 153:19-25).  Before moving to Hawaii, they bought a house in Mechanicsburg, Pennsylvania, to which they returned when Rice took a position with the Center for Strategic Leadership at the War College.  (See 5/2/16 Trial Tr. 128:16-129:1; Doc. 96, 5/3/16 Trial Tr. 79:1-12).

Rice-Goldie learned her husband had a pornography addiction in September 2003, soon after arriving in the United States.  (See 5/2/16 Trial Tr. 129:9-25).  Rice inadvertently had left Yahoo! Instant Messenger open on the family's communal computer in his son's room.  (See id. at 129:17-20, 130:1-3).  Rice-Goldie discovered Rice "was discussing sexual matters with someone on there, and that led [her] to look to see what was being downloaded."  (See id. at 129:20-23, 130:4-6).  She found "folders full of adult pornography."  (See id. at 130:7-8).  When she confronted Rice, he admitted the chats were his.  (See id. at 130:9-20).  He told her he had a problem and he had assumed it would "dissipate somewhat," and hopefully stop altogether, following their marriage.  (See id. at 131:15-24).  Although Rice's pornography

habits ceased for a time, they did not abate entirely.  (See id. at 131:23-133:5).  Rice-Goldie asked Rice to buy another computer to limit the children's exposure to pornography.  (See id. at 132:4-11).  Rice agreed, and eventually settled into a noticeable routine: he would "come home from work most nights and go directly up to the computer and pretty much be there until dinner time, and then return there afterwards."  (See id. at 132:11-13).

**B.      Rice's Laptop and Child Pornography**

Rice-Goldie found something "more disturbing" on Rice's computer involving "young children" at some point during their first year of marriage.  (See id. at 133:7-22).  Rice insisted he was just chatting with someone on Yahoo! when that person unexpectedly sent him an explicit image.  (See id. at 135:15-22, 136:3-12).  Rice-Goldie was not sure if Rice was telling the truth, but she believed the other user had instigated the chat; she warned Rice she would contact "the appropriate authorities" if she ever saw similar images in the future.  (See id. at 135:22-25).  Rice apologized and said he "wouldn't do it again."  (See id. at 136:2).

As time went by, Rice-Goldie occasionally observed material on Rice's computer that was "usually more than [she] could look at."  (See id. at 136:21-137:4).  Sometimes she ignored it; other times she confronted him.  (See id. at 136:24-137:1, 138:5-11).  Rice-Goldie grew suspicious "something was up" anytime Rice became "withdrawn."  (See id. at 138:25-139:4).  She downloaded a "key logger" to record what Rice typed into his computer, including usernames and passwords to websites like Yahoo! and Facebook.  (See id. at 137:5-138:5; 5/3/16 Trial Tr. 7:16-8:9, 9:3-11, 11:21-15:1).  Rice-Goldie believed Rice must have known she used the key logger

because she "always" confronted him after accessing unfamiliar websites using his information, which happened at least 20 times over a 10-year period.  (See 5/2/16 Trial Tr. 138:5-23).  She confiscated his thumb drives on a few occasions, too, and either erased or hid them.  (See id. at 139:20-140:15; 5/3/16 Trial Tr. 26:17-27:11).

These recurring flash points strained the couple's marriage.  (See 5/2/16 Trial Tr. 139:5-8).  Rice-Goldie lived apart from her husband for six months in early 2012 before moving back home.  (See id. at 139:9-16; 5/3/16 Trial Tr. 45:8-23, 46:20-24).  She bought a Lenovo laptop that November as a backup for her malfunctioning Hewlett-Packard ("HP"), and anticipated sharing the new computer with Rice.  (See 5/2/16 Trial Tr. 140:18-142:3; 5/3/16 Trial Tr. 18:6-24, 30:8-13).  Rice's reluctance to share the Lenovo raised Rice-Goldie's suspicions, but he soon relented.  (See 5/2/16 Trial Tr. 142:3-9).  Rice-Goldie discovered to her dismay Rice was talking to other men online and advertising meetups on Craigslist.  (See id. at 143:23-144:1; 5/3/16 Trial Tr. 17:7-13).  She demanded Rice relinquish his personal laptop, and he complied.  (See 5/2/16 Trial Tr. 144:4-19; 5/3/16 Trial Tr. 21:20-22:3).  Rice's laptop had three profiles: his primary account ("RobertsComputer"), a secondary account he created specifically for Rice-Goldie ("Rob's Computer"), and a guest account.  (See 5/2/16 Trial Tr. 144:19-23; 5/3/16 Trial Tr. 97:4-98:1).  Rice divulged the password for the secondary account, but denied access to his own.  (See 5/2/16 Trial Tr. 144:23-24).

Rice-Goldie made plans to visit friends in Florida from January 24 through January 28, 2013.  (See id. at 145:10-146:2).  She and Rice were empty-nesters by this point, so Rice was to have the house to himself.  (See 5/3/16 Trial Tr. 4:17-21).  On

January 22, Rice-Goldie restored the Lenovo to factory settings because she did not want Rice to have certain "family photographs." (See id. at 20:7-21:5, 29:14-30:7, 128:18-129:11). The next day, she used the secondary account on Rice's laptop to purchase, download, and install "Spector Pro," commercially available software that facilitates monitoring a person's computer and internet activities in secret. (See 5/2/16 Trial Tr. 146:6-21, 147:9-14, 148:5-7; 5/3/16 Trial Tr. 120:4-9).

Spector Pro contains several important covert features and comes with detailed instructions for evading detection. (See 5/2/16 Trial Tr. 148:13-149:12; 5/3/16 Trial Tr. 9:12-22, 172:19-173:12, 175:14-176:8). Once installed, the program operates in "stealth mode," surreptitiously taking screenshots of the monitored computer's display at six-second intervals while in use; it also captures virtually every keystroke the user employs, including passwords, website URLs, web searches, emails, online chat logs, and file-sharing activities. (See 5/2/16 Trial Tr. 147:15-20; 5/3/16 Trial Tr. 104:19-105:25, 107:6-24; 5/4/16 Trial Tr. 62:19-20). Spector Pro catalogues all the information it captures and saves it in an encrypted database from which amateur and professional sleuths alike can generate text reports. (See 5/3/16 Trial Tr. 107:25-7, 109:7-10, 171:10-172:13). Given the enormous amount of data Spector Pro might collect if left to run in perpetuity, it stores image files in black and white and regularly deletes, or overwrites, its database file to conserve memory. (See id. at 108:8-109:6, 143:25-144:11). Not only is access to Spector Pro's data password protected,[2] but to prevent inadvertent discovery, the user must enter

---

[2] Rice-Goldie's password was "Kiss my ass Rob." (See 5/3/16 Trial Tr. 120:10-16).

a unique set of keystrokes just to reveal the nondescript password screen.  (See id. at 15:2-16:10, 106:1-107:5).  Some deleted data can be recovered from Spector Pro's database files with the right tools and technical knowhow, though the process may be difficult and there is no guarantee of completeness.  (See id. at 109:11-13, 120:17-122:5, 144:20-145:1).

Rice drove Rice-Goldie to Baltimore, Maryland, on January 24 for an 8:10 a.m. flight.  (See id. at 153:14-23; see also Gov't Ex. 24).  Rice-Goldie had a busy vacation agenda.  She did some shopping, went to a beach in Sarasota, attended the Gasparilla Pirate Festival in Tampa Bay, toured the University of Tampa, and dined with her girlfriends late into the evening.  (See 5/3/16 Trial Tr. 33:12-34:11, 71:20-74:17).  Rice-Goldie's friends noticed she was "a little quiet that weekend," though she rarely left their sights and barely spent any time on her electronic devices.  (See id. at 74:18-76:15).  Rice-Goldie did not have remote access to Rice's laptop at any point during her trip; she used her iPad once to log into his Facebook account for 20 seconds at the Tampa airport while waiting for her return flight, but did not communicate with anyone or post anything under his name.  (See 5/2/16 Trial Tr. 168:21-25, 169:13-14; 5/3/16 Trial Tr. 32:2-33:11, 34:19-35:18; 5/4/16 Trial Tr. 34:4-35:7).

Rice-Goldie arrived back in Baltimore around 10:00 a.m. on January 28.  (See 5/2/16 Trial Tr. 153:24-154:2).  She waited a day before logging into Spector Pro while Rice was at work.  (See id. at 155:9-24, 158:9-13).  What she found shocked her.  (See id. at 160:6).  The program recorded Rice discussing child pornography in chat rooms, visiting websites displaying sexually explicit material, and uploading and downloading files that appeared to contain "horrific images" of children engaged in

sexual acts with adults. (See id. at 155:25-157:25). One image—that of a "little girl . . . being forced to perform a sexual act on an adult male"—troubled Rice-Goldie especially. (See 5/3/16 Trial Tr. 6:1-7:1). Rice-Goldie confronted Rice when he got home. (See 5/2/16 Trial Tr. 158:3-13; 5/3/16 Trial Tr. 35:19-36:3). He expressed remorse and said he "needed help." (See 5/2/16 Trial Tr. 158:16-18). She asked him to leave, and he agreed. (See id. at 158:19-24; 5/3/16 Trial Tr. 28:15-29:3). Fearing Rice might attempt to destroy evidence, Rice-Goldie hid his laptop in the attic. (See 5/2/16 Trial Tr. 159:15-160:2; 5/3/16 Trial Tr. 31:14-17). Rice returned to the house two days later for a brief discussion about how to pay the mortgage and other bills. (See 5/3/16 Trial Tr. 36:11-16). He was "extremely agitated" and repeatedly asked where the laptop was, but Rice-Goldie would not tell him. (See id. at 36:16-37:4). Rice-Goldie assumed Rice thought she was trying to blackmail him based upon his reaction. (See id. at 36:4-37:8). She ended the conversation without resolving their financial issues. (See id. at 37:3-8).

Rice-Goldie agonized about what to do; she relocated the laptop to a safe deposit box at Citizens Bank, sought advice from her parents and eldest daughter, and searched in vain for answers online. (See 5/2/16 Trial Tr. 159:3-25, 160:3-161:6, 166:16-167:6; 5/3/16 Trial Tr. 49:13-22). She briefly retrieved the laptop a few days later to try copying what she found onto "some disks" and a flash drive in case something happened to the device, yet abandoned her efforts because the amount of data dwarfed available storage space. (See 5/2/16 Trial Tr. 162:12-164:11; 5/3/16 Trial Tr. 21:24-23:11, 24:4-16, 25:13-26:11; see also Gov't Ex. 23). On February 7— more than a week after discovering Rice's activities—Rice-Goldie took the laptop

from the bank and went to the Silver Spring Township Police Department in Cumberland County to report a crime.  (See 5/2/16 Trial Tr. 164:15-165:1).

### C.    Criminal Investigation

Detectives took Rice-Goldie's statement and then obtained a warrant to search the laptop.  (See 5/3/16 Trial Tr. 91:7-17, 123:23-125:24).[3]  Detective Ryan Parthemore, a forensic examiner and supervisor of the computer forensics lab at the Cumberland County District Attorney's Office, analyzed the digital evidence. (See id. at 85:21-87:1).  He began by "creating a forensic image of the laptop's hard drive"—i.e., a digital copy of the drive's contents that may be inspected without risk of compromising the original device or irreversibly changing any data.  (See id. at 90:19-94:12).  Three software programs besides Spector Pro stood out as "somewhat out of the ordinary."  (See id. at 98:1-3).  Two still functioned: a December 2010 installation of "System and Internet Washer Pro"—a program "designed to remove activity [like browser history and unused hard drive applications] from a computer such that it would hamper a subsequent review of that computer"—and "Team Viewer," which allows a user to remotely control another computer.  (See id. at 98:4-99:2, 114:11-115:23, 142:3-16).[4]  The third program, "IP Hider," lets users mask their

---

[3] Rice-Goldie also handed over the flash drive and three DVDs she used to copy the laptop's contents.  (See 5/3/16 Trial Tr. 125:21-24).

[4] System and Internet Washer Pro does not interfere with Spector Pro's processes per se, but it might purge data Spector Pro already has deleted from its database, potentially rendering it unrecoverable.  (See 5/3/16 Trial Tr. 115:24-25, 144:20-145:23).  Detective Parthemore was not worried about that in this case because he obtained "backup versions" of Spector Pro's data from "volume shadow copies within the Windows operating system."  (See id. at 145:21-146:1).

IP addresses to surf the internet anonymously, but the version on Rice's laptop came with a free trial period and evidently no longer worked.  (See id. at 141:6-24).

Detective Parthemore discovered child pornography on Rice's laptop "in two distinct areas" wholly unrelated to Spector Pro: the Windows thumb cache and a cache specifically created by Yahoo! Instant Messenger.  (See id. at 99:21-100:9).  The detective explained Yahoo!'s messaging application contains a photo-sharing feature, and the cache associated with that program saves the original version of each picture a user sends or receives, a thumbnail of the same, and a text file that logs when the application is used and with whom a user communicated.  (See id. at 101:1-102:22).  Windows' operating system also creates thumbnails of pictures saved on the hard drive and stores them in a database, or thumb cache, to speed up load times when someone wants to view several photographs at once in icon mode rather than individually.  (See id. at 102:23-104:5).  Detective Parthemore found numerous images depicting suspected child pornography in the Yahoo! photo cache on Rice's laptop with a creation date of April 27, 2010, along with "thousands" of undated thumbnail images—perhaps "in excess of ten thousand"—of similar material in the Windows thumb cache.  (See id. at 104:6-9, 163:19-164:24, 190:1-8).  He also identified dozens of empty folders with names "consistent with pornography" and pornographic "terminology," all of which someone had deleted on April 26, 2010.  (See id. at 187:8-188:2).

Detective Parthemore obtained detailed Spector Pro reports of Rice's laptop activities, including chat logs, emails, file transfers, keystrokes, online searches, and websites visited.  (See id. at 110:2-114:2; see also Gov't Exs. 1-10).  Rice visited

Facebook 174 times between January 24 and January 29, totaling five hours; he spent seven hours on imagefap.com and imgsrc.ru ("Image Source"), websites catering to individuals looking for child pornography; and he perused Yahoo!, Craigslist, and a series of pornographic websites for less than an hour each. (See 5/3/16 Trial Tr. 228:14-229:3; see also Gov't Ex. 9). Detective Parthemore also retrieved 12,972 screenshots from the program's database that captured these events in real-time. (See 5/3/16 Trial Tr. 114:8-10).

State investigators used Detective Parthemore's findings to obtain a search warrant for Rice's home. (See 5/2/16 Trial Tr. 165:4-10; 5/3/16 Trial Tr. 94:13-20). They seized numerous electronic devices for further examination, including the Lenovo and HP laptops, printers, auxiliary cables, and CDs and flash drives, several of which Rice-Goldie used in her failed attempt to copy the contents of Rice's laptop, but allowed Rice-Goldie to keep her iPad. (See 5/2/16 Trial Tr. 165:11-166:15, 172:14-18). Detective Parthemore inspected these materials as well. He found three color images of suspected child pornography with a creation date of January 7, 2013, on a thumb drive containing a text file of Rice's usernames and passwords dating to 2009; those images did not appear on any other media the detective reviewed. (See 5/3/16 Trial Tr. 159:18-163:18). He recovered more suspected child pornography in the recycle bin of an external hard drive that had been connected to Rice's laptop at one time, along with various documents, personal correspondence, and educational papers attributable to Rice. (See id. at 116:1-117:20, 122:6-123:7). The hard drive was configured to a Windows computer with a single user account called "PZ Marilyn," and the deleted images originated from a folder named "Rob's

Files."  (See id. at 168:25-170:17; 5/4/16 Trial Tr. 145:17-146:14).  Detective

Parthemore discovered nothing noteworthy on the other laptops, though he did not

check them for any of the computer programs described above.  (See 5/3/16 Trial Tr.

150:9-153:5, 183:23-184:11).

Pennsylvania authorities sought assistance from federal law enforcement

agencies given the complexity of the investigation.  (See id. at 200:21-24).  Special

Agent Trac Huynh, an investigator with the United States Department of Homeland

Security specializing in child exploitation crimes, coordinated the joint effort.  (See

id. at 190:21-24, 192:4-193:1, 199:13-16, 200:25-201:7).  He built upon Detective

Parthemore's forensic examination by cataloguing Spector Pro's 12,972 screenshots

and reports and cross-referencing them with outside sources.  (See 5/4/16 Trial Tr.

40:5-43:15, 56:22-89:5, 91:20-10; see also Gov't Exs. 29.1-29.7).  Online messaging apps

proved critical to Agent Huynh's investigation.  He reviewed Spector Pro's activity

reports and discovered a Facebook chat between Rice and his son, Kyle, on January

27, 2013, around the same time a Yahoo! user with the screen name

"justaguy654321" was active on Rice's laptop.  (See 5/3/16 Trial Tr. 201:8-202:15,

213:6-215:4; see also Gov't Ex. 2).  Yahoo! chat logs show "Just A Guy"

communicated and traded child pornography with 14 individuals while Rice-Goldie

was out of town.  (See 5/3/16 Trial Tr. 207:11-13; 5/4/16 Trial Tr. 108:19-109:1).  What

follows is a sample of those nefarious exchanges.

On January 24, "Just A Guy" traded video files and images depicting child

pornography with "kevin.mille."  (See 5/3/16 Trial Tr. 203:12-205:14).  He shared a

file he received from "kevin.mille" with a different user, "jacquessanto," early the

next morning.  (See id. at 205:20-206:12).  "Just A Guy" then requested material from "the Van series," a compilation of child pornography known to law enforcement that depicts prepubescent girls engaging in sexual acts with an adult male.  (See id. at 206:15-23).  "Jacquessanto" obliged, trading 55 images of child pornography from the Van series to "Just A Guy" in exchange for 48 images from the same compilation.  (See id. at 206:24-207:5).  "Just A Guy" discussed and traded videos containing child pornography with "sdoo562" between 7:49 a.m. and 8:30 a.m. on January 26.  (See id. at 208:16-209:14).  That same day, he directed "freshmeat297" to fetch pictures from Image Source; "Fresh Meat" eventually transmitted a file containing child erotica.  (See id. at 209:15-210:21; see also id. at 210:22-211:12 (distinguishing erotica from pornography)).  On January 27, "Just A Guy" received 159 images of child pornography from, and sent 54 illicit images of children to, "ukwankbuddy."  (See id. at 211:13-213:1).  By Agent Huynh's tally, "Just A Guy" received a total of 359 images of child pornography and distributed 165 images via Yahoo! between January 23 and January 27.  (See 5/4/16 Trial Tr. 109:2-10, 148:15-149:7).

In addition to these chats, at 10:30 a.m. on January 24, an individual going by "Joe Roberts" and using the email handle "justaguy654321@yahoo.com" responded to a Craigslist advertisement seeking a male-for-male casual encounter posted by "looking4you17112@yahoo.com."  (See 5/3/16 Trial Tr. 215:5-216:25 (referencing Gov't Ex. 4); see also id. at 227:20-228:9 (referencing Gov't Ex. 8)).  "Just A Guy" gave his age ("50yo") and physical characteristics ("6ft, 210[lbs]") and advised "Looking for You" he lives in Mechanicsburg and his "[w]ife is away for a few

days." (See id. at 217:1-9). "Just A Guy" followed up with a cropped photograph of male genitalia from the waist down. (See id. at 217:10-19, 218:5-13). Agent Huynh discovered through additional forensic analysis that, before emailing the cropped image, "Just A Guy" initially had selected a full-body photograph of the same individual from a folder titled "Cock"—the subject was none other than Rice. (See id. at 221:11-222:21). Furthermore, the folder containing both photographs was on a USB drive ("the removable F drive") that had to be physically inserted into the computer from which "Just A Guy" sent the email; Agent Huynh found many similar selfies Rice had taken of his face and naked body. (See id. at 217:20-218:5, 221:23-222:21).

Investigators subpoenaed several entities to corroborate the internet-related activities captured by Spector Pro. Verizon, the couple's phone and internet service provider, supplied call detail records for their phones along with IP addresses associated with the Mechanicsburg home between January 24 and January 28, 2013. (See 5/3/16 Trial Tr. 130:10-21, 134:25-135:8; 5/4/16 Trial Tr. 12:15-21; see generally 5/3/16 Trial Tr. 129:17-133:22 (discussing dynamic nature of IP addresses)). Those records confirm Rice's cell phone was in use in Pennsylvania while Rice-Goldie's cell phone was in Florida; they also show the Mechanicsburg home lost internet between 5:33 a.m. and 12:25 p.m. on January 26, when the IP address changed over. (See 5/3/16 Trial Tr. 133:23-134:8, 135:18-137:14, 138:22-139:4; 5/4/16 Trial Tr. 12:22-16:3, 49:22-52:23; see also Gov't Exs. 11-13, 26.3). The seven-hour internet blackout is noteworthy because Spector Pro captured numerous images of someone using Rice's laptop to organize a collection of child pornography on the removable F drive

during that period, which only could have been accomplished in person.  (See 5/4/16 Trial Tr. 52:24-53:8, 91:20-94:10).

Records from several financial institutions show Rice signed into his bank accounts from Mechanicsburg on the night of January 24 around the same time "Just A Guy" was fishing for contraband on Yahoo!  (See 5/3/16 Trial Tr. 16:8-18:22; see also Gov't Exs. 14-16).  The War College also provided swipe logs establishing when Rice arrived at work and left campus.  (See Gov't Ex. 22).  Investigators compared those logs to phone records and login times for Facebook and other applications to confirm Rice's presence at home, at work, and near the Baltimore airport that week.  (See 5/4/16 Trial Tr. 46:17-52:3, 53:9-55:24, see also Gov't Exs. 30.1-30.6).

### D.    Indictments, Court-Martial, Plea Negotiations, and Trial

On April 3, 2013, Cumberland County authorities filed a criminal complaint charging Rice with 130 counts of possessing child pornography and one count of criminal use of a communication facility.  (See Doc. 118 ¶ 39).  Rice retained Joseph Caraciolo, Esquire, ahead of his preliminary hearing, following which the court held Rice's charges for trial.  (See Doc. 192, 4/30/21 Hr'g Tr. 7:3-10).  A federal grand jury returned a two-count indictment on May 14, 2014, charging Rice with two crimes: possessing child pornography (Count One) and receiving and distributing same (Count Two).  (See Doc. 1).[5]  Concurrently with these criminal proceedings, on September 17, 2015, a military convening authority referred several charges and

---

[5] The Commonwealth of Pennsylvania *nolle prossed* Rice's charges less than two months after his federal indictment.  (See Doc. 118 ¶ 39).

specifications to a general court-martial as violations of Article 134 of the Uniform Code of Military Justice, including:

> (1) that [Rice] distributed six images of child pornography on the HP laptop between November 30, 2010 and December 6, 2010 (Charge II, Specification 2); (2) that [Rice] possessed forty-five images of child pornography on the same HP laptop between November 25, 2010 and January 11, 2012 (Charge II, Specification 3); and (3) that [Rice] possessed six videos of child pornography on his external hard drive on November 14, 2010 (Charge II, Specification 4).

See United States v. Rice, 80 M.J. 36, 38-39 (C.A.A.F. 2020).

Rice's efforts to resolve the matter *sub judice* pretrial did not bear fruit. He unsuccessfully litigated several motions to suppress. (See Doc. 43). He also considered three successive plea offers. (See Doc. 185, 5/14/21 Hr'g Tr. 22:3-9). As we will discuss in greater detail *infra*, Rice rejected each offer, for one reason or another, and proceeded to trial. (See id. at 31:19-32:9).

Rice was tried by a jury from May 2 through May 6, 2016. Rice-Goldie, Detective Parthemore, Agent Huynh, and others testified to the foregoing facts. Rice-Goldie professed she  had little computer savvy apart from her limited experience with the British army's "extremely antiquated" internal computer system. (See 5/2/16 Trial Tr. 169:23-171:5). Indeed, she was unsure if Spector Pro even would capture Rice's activities on his primary account since she installed it using the secondary profile. (See id. at 149:17-150:1).[6] She told the jury she never manipulated Spector Pro data, never logged into websites other than Facebook,

---

[6] Rice-Goldie testified she previously had installed Spector Pro on a computer in her home, but she could not recall when or what it recorded, if anything. (See 5/3/16 Trial Tr. 8:10-9:2).

never pretended to be Rice on Yahoo! or Craigslist, and never downloaded or distributed child pornography.  (See id. at 169:16-22; 5/3/16 Trial Tr. 66:9-2, 69:9-70:6).

The defense, for its part, advanced the theory that Rice-Goldie fabricated the evidence against her husband as blackmail for "leverage in a divorce settlement." (See 5/14/21 Hr'g Tr. 28:17-21; 4/30/21 Hr'g Tr. 25:2-18).  To that end, Attorney Caraciolo emphasized Rice-Goldie's motive and opportunity.  He probed her financial incentives with inquiries about monthly payments Rice started making after she hid the laptop, as well as "a large lump sum" payment of $20,000 she received from liquidation of bank stock held by his late father's estate.  (See 5/3/16 Trial Tr. 37:9-19, 44:7-9).  Rice-Goldie explained the lump-sum payment was made around November 2013 as alimony *pendente lite* because she was divorcing Rice and had no money for legal bills.  (See id. at 38:22-39:7, 44:10-20, 68:4-69:6).  She also acknowledged not having worked in several years, save for a brief stint following their separation in 2012, and she worried about the family's precarious financial situation throughout the ordeal.  (See 5/2/16 Trial Tr. 167:7-16; 5/3/16 Trial Tr. 44:23-47:7).  The couple shared a credit card with a $1,200 limit, but Rice handled nearly all the bills as the primary (and, often, sole) breadwinner; if the army suspended his pay or discharged him, they might miss mortgage payments and lose the house. (See 5/2/16 Trial Tr. 167:20-168:1, 171:22-172:13).  The War College forbade Rice from contacting Rice-Goldie, so the college's chief of staff served as intermediary and coordinated with Cumberland County authorities.  (See id. at 168:2-9; 5/3/16 Trial Tr. 79:23-81:6).  Rice-Goldie requested access to Rice's bank accounts to pay

bills, but he refused, changed the passwords to his online accounts, and set up automatic payments for the mortgage and utilities instead.  (See 5/2/16 Trial Tr. 168:9-15; 5/3/16 Trial Tr. 37:20-38:13, 81:7-82:16).

Attorney Caraciolo sought to cast doubt on Spector Pro's accuracy and the thoroughness of the investigation into Rice-Goldie, whom investigators initially considered a suspect.  (See, e.g., 5/3/16 Trial Tr. 176:19-178:9; 5/4/16 Trial Tr. 114:25-116:3, 124:18-125:25, 137:24-138:1, 141:16-142:14; Doc. 98, 5/5/16 Trial Tr. 131:15-137:20).  Detective Parthemore acknowledged gaps in the Spector Pro screenshots that could have resulted from natural processes or deliberate deletion of certain databases.  (See 5/3/16 Trial Tr. 178:17-181:9; see also 5/5/16 Trial Tr. 121:13-122:13).  He also conceded three illicit images found on a flash drive could have been on the Lenovo before Rice-Goldie reset it.  (See 5/3/16 Trial Tr. 184:15-19).  The defense challenged Rice-Goldie to explain how child pornography with a download date of January 7, 2013, came to be on a thumb drive she admitted was in her sole possession at that time, but she could not say.  (See id. at 24:9-28:14).  Nor could she recall why she reset the Lenovo; she thought she had deleted files from her malfunctioning HP laptop so Rice could use it for work.  (See id. at 29:14-30:18).  Defense counsel pressed Agent Huynh to explain why he only inspected one of the flash drives investigators seized but did not review Rice-Goldie's iPad or the two other laptops in her possession.  (See 5/4/16 Trial Tr. 110:6-111:19, 113:8-114:24).  Investigators never subpoenaed Rice-Goldie's email records, or checked on her whereabouts in April 2010, when someone was saving and deleting child pornography on a hard drive that might have been with her in Hawaii while Rice

was stationed overseas.  (See id. at 117:21-119:19, 129:16-25, 138:17-141:9; see also id. at 153:19-25).

Rice called three witnesses.  Dr. Rebecca Mercuri, Ph.D., and Jeffrey Cunningham, two experts with decades of experience in the field of computer forensics, testified at length about technical shortcomings they believed undermined the investigation and cast serious doubt on Rice's identity as the perpetrator.  (See id. at 155:17-179:4; 5/5/16 Trial Tr. 3:6-46:17, 82:22-84:3, 84:24-102:6, 113:20-115:14).  Colonel John Price, the defense's only fact witness, testified briefly about Rice's deployments to the Middle East in 2009 and 2010.  (See 5/4/16 Trial Tr. 153:2-25).  Rice did not introduce any character evidence.

After four days of testimony, the jury found Rice guilty on both counts.  (See Doc. 84 at 1).  The jury specifically determined Rice possessed child pornography between August 2010 and January 29, 2013, and he received and distributed child pornography from January 23 through January 28, 2013.  (See id. at 2).

### E.   Court-Martial Plea, Sentencing, and Appeals

Following trial in the matter *sub judice*, but before sentencing, Rice moved to dismiss the related military charges for which he had been court-martialed on the ground they violated the Double Jeopardy Clause of the Fifth Amendment.  See Rice, 80 M.J. at 39.  A military judge denied Rice's motion.  See id.  Rice then entered a conditional guilty plea, and the military judge sentenced him to four

years' confinement and dismissed him from the Army.[7]  <u>See</u> <u>id.</u>  Rice began serving

that sentence on October 24, 2016.  (<u>See</u> Doc. 118 ¶ 60).

Peter Goldberger, Esquire, replaced Attorney Caraciolo as Rice's civilian

post-trial and appellate counsel.  (<u>See</u> Doc. 161 ¶ 4).  Rice then moved to dismiss

Count One of the indictment on double-jeopardy grounds in light of his military

conviction and sentence.  (<u>See</u> Doc. 106).  The government did not oppose Rice's

request.  (<u>See</u> Doc. 111).  We granted the motion and sentenced Rice to 142 months'

imprisonment on Count Two, including two months' credit for time served, to run

concurrently with his four-year military sentence.  (<u>See</u> Doc. 124).  Rice's sentence

reflected a 40% downward variance from his Guidelines range of 20 years, the

statutory maximum for his offense.  (<u>See</u> Doc. 118 ¶¶ 58-59).

Rice appealed both convictions.  Our court of appeals affirmed,

characterizing the evidence against him as "overwhelming."  <u>See</u> <u>United States</u>

<u>v. Rice</u>, 716 F. App'x 121, 122-24 (3d Cir. 2017) (nonprecedential).  The Supreme

Court of the United States denied his petition for a writ of *certiorari*.  <u>See</u> <u>Rice</u>

<u>v. United States</u>, 138 S. Ct. 2034 (2018) (mem.).  Rice's arguments fared much better

in a military setting, where his double-jeopardy claim found purchase in the United

States Court of Appeals for the Armed Forces.  That court dismissed outright his

convictions for possessing child pornography and remanded the case to an

intermediate appellate panel to determine whether his conviction on Count One in

---

[7] Rice's initial sentence was five years, but the parties had entered into a
pretrial agreement, known as a "quantum," limiting his exposure to four years.
(<u>See</u> Doc. 35 ¶ 35).

this court was a lesser-included offense of the distribution specification to which he

pled guilty. <u>See</u> <u>Rice</u>, 80 M.J. at 45-46. The United States Army Court of Criminal

Appeals resolved that question in Rice's favor and dismissed his only remaining

military conviction; accordingly, Rice "stands convicted of no military offenses."

<u>See</u> <u>United States v. Rice</u>, Army 20160695, 2020 WL 6256712, at *2 (A. Ct. Crim. App.

Oct. 22, 2020).

> ### F.   Section 2255 Motion

Rice timely filed the instant motion pursuant to 28 U.S.C. § 2255, raising six

grounds of ineffective assistance of counsel. We held an evidentiary hearing on

April 30 and May 14, 2021, at which Rice, Attorney Caraciolo, and Colonel (Ret.)

Scott Forsythe testified; Attorney Goldberger submitted an affidavit in lieu of

testifying. Relevant aspects of their accounts feature in our analysis of Rice's

arguments. <u>See</u> Part III, *infra*. The motion is fully briefed and ripe for disposition.

## II.   <u>Legal Standards</u>

> ### A.   Section 2255

Under 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to

vacate, set aside, or correct the prisoner's sentence. 28 U.S.C. § 2255. Courts may

afford relief under Section 2255 on several grounds, including, *inter alia*, "that the

sentence was imposed in violation of the Constitution or the laws of the United

States." <u>See</u> 28 U.S.C. § 2255(a); <u>see also</u> 28 U.S.C. § 2255 Rule 1(a). The statute

provides that, as a remedy for an unlawfully imposed sentence, "the court shall

vacate and set the judgment aside and shall discharge the prisoner or resentence

him or grant a new trial or correct the sentence as may appear appropriate." <u>See</u>

28 U.S.C. § 2255(b).  The court accepts the truth of the defendant's allegations when reviewing a Section 2255 motion unless those allegations are "clearly frivolous based on the existing record."  See United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  A court must hold an evidentiary hearing when the motion "allege[s] any facts warranting § 2255 relief that are not clearly resolved by the record."  See United States v. Tolliver, 800 F.3d 138, 141 (3d Cir. 2015) (quoting Booth, 432 F.3d at 546).

**B.     Ineffective Assistance of Counsel**

A collateral attack based on ineffective assistance of counsel is governed by the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on such a claim, a defendant must demonstrate (1) counsel's representation fell below an objective level of reasonableness based on prevailing professional norms, and (2) the deficient representation was prejudicial.  See Strickland, 466 U.S. at 687-88.  The defendant bears the burden of proving both prongs.  See id. at 687.

To determine whether counsel has satisfied the objective standard of reasonableness under the first prong, courts must be "highly deferential" toward counsel's conduct.  See id. at 689.  There is a strong presumption that counsel's performance falls within the broad range of reasonable professional assistance.  See United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989).  Only a "rare claim" of ineffectiveness of counsel should succeed "under the properly deferential standard to be applied in scrutinizing counsel's performance."  Id. at 711 (citing Strickland, 466 U.S. at 689-90).  To satisfy the prejudice prong, the defendant must establish a

reasonable probability that, but for counsel's errors, the outcome of the proceeding "would have been different." Strickland, 466 U.S. at 694. The district court need not conduct its analysis of the two prongs in a particular order or even address both prongs of the inquiry if the defendant makes an insufficient showing in one. See id. at 697; United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008).

**III.   Discussion[8]**

Five of Rice's six grounds for relief pertain to trial counsel's stewardship. Rice alleges Attorney Caraciolo failed to (1) object to introduction at trial of prejudicial marital communications; (2) discuss, investigate, and call character witnesses, and request a jury instruction on character evidence; (3) discuss a conditional plea agreement; (4) provide a reasonable prognosis about Rice's odds of winning at trial, leading him to reject or not pursue nontrial dispositions; and (5) adequately advise Rice of his true sentencing exposure, thus causing him to reject a plea agreement. (See Doc. 132 at 3-10). Rice also contests Attorney Goldberger's failure to challenge Count Two on double-jeopardy grounds. (See id. at 10-12). We address each issue *seriatim*.

**A.   Ground 1: Marital Communications**

Rice asserts Attorney Caraciolo should have objected to Rice-Goldie's testimony about conversations he had with her "over the years" regarding his

---

[8] Our recitation of facts from the evidentiary hearing in this matter reflects the court's credibility determinations. We find the testimony of Attorney Caraciolo and Colonel Forsythe, and the averments of Attorney Goldberger, to be highly credible. Conversely, we find Rice's testimony incredible in certain relevant respects as set forth herein.

purported addiction to pornography and certain admissions he made to her in that regard.  (See Doc. 132 at 4 (citing 5/2/16 Trial Tr. 129-38, 158)).  The basis for such an objection would have been the marital communications privilege, pursuant to which one spouse may preclude another from testifying about private communications between them during their marriage.  See Blau v. United States, 340 U.S. 332, 333-34 (1951) (citing Wolfle v. United States, 291 U.S. 7, 14 (1934)).  Either spouse may invoke the privilege, and it survives dissolution of the marriage, whether by divorce or death.  See Pereira v. United States, 347 U.S. 1, 6 (1954); United States v. Hill, 967 F.2d 902, 911 (1992).

Attorney Caraciolo testified he and Rice discussed "the possibility of keeping" Rice-Goldie's testimony about Rice's revelations "out" of the trial.  (See 4/30/21 Hr'g Tr. 39:20-40:2, 70:24-71:7, 71:14-15).  They conferred about what she might say, weighed the pros and cons, and strategized about ways to cross-examine her.  (See id. at 58:16-22, 60:22-61:6, 77:1-21).  Counsel "[u]ltimately" decided letting Rice-Goldie testify was preferable because he believed "some of the other things that she would testify to actually" would bolster their frame-up defense.  (See id. at 40:2-4, 71:11-18).  Allowing her to testify also obviated the need to put Rice on the stand.  (See id. at 71:20-72:6).  Rice approved the strategy of pinning the blame on Rice-Goldie.  (See id. at 58:23-59:3; see also 5/14/21 Hr'g Tr. 35:17-36:16).  That approach necessitated establishing her financial motives, and Rice opted to do so by relating conversations they had about support money soon after Rice-Goldie hid his laptop.  (See 4/30/21 Hr'g Tr. 59:4-61:11).  "In hindsight," Attorney Caraciolo felt he

"probably should have objected to [Rice-Goldie's testimony] rather than trying to bring it in."  (See id. at 40:4-6).

We find Attorney Caraciolo had an objectively reasonable basis for not seeking to preclude Rice-Goldie's testimony, notwithstanding his present misgivings.  Counsel knew he could not stop Rice-Goldie from testifying about her personal observations, so by enabling her to recall conversations she had with Rice, the defense had a foundation from which it plausibly could cast aspersions about her motives.  Rice-Goldie testified Rice admitted having a pornography addiction and that she frequently confronted him after finding *adult* pornography on his computer.  (See 5/2/16 Trial Tr. 129:9-25, 130:7-20, 131:15-24).  The first time she found something involving children, it came in the form of what she agreed was an unprompted message from a Yahoo! user.  (See id. at 133:14-22, 135:15-136:12).  She warned Rice and claimed he apologized for the episode and said he "wouldn't do it again," (see id. at 136:2)—leaving "it" vaguely undefined.  Viewing that conversation in a light favorable to Rice, his admission and apology could cohere with the theory he struggled with an addiction to adult pornography that led him to engage in risky behavior with anonymous people online, including the unscrupulous peddler of child pornography who sent that unbidden image.  Hence, the "it" Rice promised not to do "again" might have been a general reference to his regrettable cyber peccadilloes.

Rice-Goldie frequently monitored Rice's computer activities over the next decade, demanding his passwords in some cases or obtaining them from a key logger she secretly installed without his knowledge.  (See id. at 137:5-138:5, 144:23-

24; 5/3/16 Trial Tr. 7:16-8:9, 9:3-11, 11:21-15:1).  Although at times she caught him talking to other men and advertising on Craigslist, she never expressly mentioned finding other images involving children on his laptop again until January 2013. (See 5/2/16 Trial Tr. 136:21-137:4, 143:23-144:1).  When those images reappeared, Rice-Goldie confronted Rice and kicked him out of the house; he returned a few days later ostensibly to discuss financial matters, but grew frustrated when Rice-Goldie refused to divulge what she did with the laptop, and left.  (See id. at 158:3-24; 5/3/16 Trial Tr. 28:15-29:3, 35:19-37:8).

Attorney Caraciolo saw strategic value in these exchanges because they could be used to suggest Rice-Goldie's malicious intent and establish her opportunity to manipulate the laptop's contents by secreting it away.  (See 4/30/21 Hr'g Tr. 40:1-4). His tactics were reasonable.  The jury could have considered the couple's stormy history and concluded Rice-Goldie grew angry at Rice for his perceived infidelities and formulated a plot to weaponize his addictive behavior and extract concessions in an impending divorce.  After all, Rice's reaction during their last meeting left Rice-Goldie wondering if he thought she was blackmailing him, and she took over a week to consider her options before alerting police.  (See 5/2/16 Trial Tr. 159:3-161:9, 166:16-167:6; 5/3/16 Trial Tr. 36:4-37:8, 49:13-22).  The last piece of the puzzle, establishing how she could have gone about fabricating digital evidence, turned upon highly technical expert testimony.  Identifying the perpetrator came down to a series of inferences, so Rice endeavored to raise doubts through his own forensic experts.  This was a high-risk-high-reward defense.  Attorney Caraciolo's strategy did not pay off in the end, but that does not mean his zealous pursuit of it was

constitutionally deficient.  See Harrington v. Richter, 562 U.S. 86, 110 (2011) (noting "an attorney may not be faulted for a reasonable miscalculation").

Assuming, *arguendo*, counsel's performance objectively was unreasonable, Rice cannot show Rice-Goldie's comments unduly prejudiced him.  The case against Rice—though circumstantial and technical in nature—was "overwhelming." See Rice, 716 F. App'x at 124.  Even Rice acknowledges he faced "a mountain of threatening evidence."  (See Doc. 182 at 20).  That evidence established Rice was home alone for the better part of a week in January 2013 soliciting and distributing hundreds of child pornographic images via Yahoo! Instant Messenger.  (See 5/4/16 Trial Tr. 109:2-10, 148:15-149-7).  The government also demonstrated Rice physically had to be at his laptop manipulating a flash drive when he emailed a nude photograph of himself to "Looking for You" and when he organized his child pornography collection during an internet blackout.  (See 5/3/16 Trial Tr. 52:24-53:8, 91:20-94:10, 215:5-218:13, 221:11-222:21, 227:20-228:9).  Those facts were enough to prove Rice's guilt notwithstanding Rice-Goldie's revelations about their marital communications.  We find no "reasonable probability" of a different outcome but for Attorney Caraciolo's failure to object to their admission.  See Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 694).

### B.    Ground 2: Character Witnesses

Rice next argues Attorney Caraciolo's failure to put on any character witnesses was glaring and inexplicable.  (See Doc. 182 at 11-16).  Absent some proof of Rice's positive traits or reputation as a law-abiding citizen, the defense could not request an instruction that jurors should consider character evidence "together

with and in the same way as all other evidence" when assessing the government's case.  See THIRD CIR. MODEL JURY INSTRUCTION 4.39.  The value of such a charge is obvious: good character evidence "may be enough to raise a reasonable doubt of guilt" in some circumstances.  See Michelson v. United States, 335 U.S. 469, 476 (1948); United States v. Logan, 717 F.2d 84, 88 (3d Cir. 1983) (citations omitted).

Rice raises a colorable argument on the first Strickland prong.  Attorney Caraciolo acknowledged they discussed calling several character witnesses on Rice's behalf.  (See 4/30/21 Hr'g Tr. 32:14-21, 35:15-20).  Rice supplied a list of names, mainly comprising his War College colleagues and two of his sons, before supposedly instructing counsel not to contact anyone at the college because he was "very embarrassed" and did not want to "make things worse."  (See id. at 32:19-22, 33:21-34:5, 42:13-15, 72:10-24, 75:15-76:22).  Attorney Caraciolo spoke with Rice's sons but opted not to call them out of concern the jury might disregard their testimony on the assumption they were "saying whatever" Rice wanted them to say; counsel did not independently reach out to anyone else.  (See id. at 72:25-73:18, 76:23-25).  Colonel Forsythe also was on Rice's list.  (See 5/14/21 Hr'g Tr. at 19:16-18).  He personally vouched for Rice as "an honest and law[-]abiding citizen" and would have spoken to Rice's "excellent reputation" among their "work community"—if only someone had asked him to testify.  (See id. at 5:5-7:6, 7:21-8:11).  In fact, Colonel Forsythe testified at Rice's court-martial and wrote a character letter ahead of sentencing in this case.  (See id. at 7:9-20).

We find Attorney Caraciolo's justification for not calling any character witnesses unsatisfactory.  Counsel subliminally played to the jurors' sympathies by

strategically referring to Rice as "colonel" and daily presenting him in his military uniform—the full trappings of a consummate, law-abiding, patriotic American.  (See 5/2/16 Trial Tr. 127:6-11; 4/31/21 Hr'g Tr. 31:20-32:13; 5/14/21 Hr'g Tr. 20:13-21:1).  It would have made perfect sense to reinforce Rice's good reputation from whatever source he could muster, if only to secure a jury charge that might "generate a reasonable doubt" as to "Just A Guy's" identity and thus "justify acquittal."  See United States v. Frischling, 160 F.2d 370, 370 (3d Cir. 1947) (citing, *inter alia*, Edgington v. United States, 164 U.S. 361 (1896)).  Even if Rice directed Attorney Caraciolo not to contact anyone at the War College out of some sense of shame, that does not explain counsel's failure to independently investigate and pursue other character witnesses, or why the defense's lone fact witness, Colonel Price, was exempted from Rice's directives.  Nor does it explain counsel's *unilateral* "deci[sion] not to use" Rice's sons because he could not pair them with a nonrelative witness.  (See 4/30/21 Hr'g Tr. 72:25-73:18).  We doubt Rice's embarrassment *vis-à-vis* his colleagues, or his "hesita[tion]" to involve his sons, would have prevented him from seeking a character charge by any means had he known its true value.  (See 5/14/21 Hr'g Tr. 20:8-12).  Accordingly, we agree with Rice that Attorney Caraciolo's decision to forgo the instruction by not calling any character witnesses was objectively unreasonable.

Rice's claim nonetheless fails on the second Strickland prong, because a character-evidence instruction likely would have made no difference in the jury's deliberations.  See Keaton v. Superintendent Greene SCI, 845 F. App'x 153, 156 (3d Cir. 2021) (nonprecedential) (testimony of family and friends unlikely to sway jury in

face of "overwhelming evidence").  The jury necessarily rejected Rice's efforts to

vilify Rice-Goldie when it found him guilty.  Evidence of his good reputation at work

or among his children would have been consistent with the government's theory

that he, like many consumers of child pornography, lived a secret life online at odds

with his public persona.  See United States v. Jager, No. 10-1531, 2011 WL 831279,

at *11 (D.N.M. Feb. 17, 2011) ("[O]ften in child pornography cases the defendant

lives a double life."); see, e.g., United States v. El-Battouty, 38 F.4th 327, 328 (3d Cir.

2022) (defendant used "fictional online persona to deceive minors" and

surreptitiously record them); United States v. Smith, No. 1:18-CR-64, 2019 WL

5692169, at *4 (N.D. Ind. Nov. 4, 2019) (defendant "lived the definition of a secret

life," serving as pastor and chaplain by day, collecting child pornography by night).

And, as previously stated, record evidence of guilt was overwhelming.  No amount

of good-character evidence could have overcome the fact that Rice stored nude

photographs of himself on the same flash drive as his collection of child

pornography, or that he physically accessed the drive during an internet blackout

when Rice-Goldie was out of town.  (See 5/3/16 Trial Tr. 217:20-218:5, 221:11-222:21;

5/4/16 Trial Tr. 52:24-53:8, 91:20-94:10).  For these reasons, we conclude Rice has

failed to extract prejudice from Attorney Caraciolo's oversight.

### C.      Ground 3: Conditional Plea Agreement

Rice faults Attorney Caraciolo for failing to discuss and pursue a conditional

plea agreement that would have permitted him to challenge our pretrial orders

denying his motions to suppress.  (See Doc. 182 at 16-19; see also 5/14/21 Hr'g Tr.

29:14-21, 56:23-57:1, 57:25-58:8).  Attorney Caraciolo did not ask the government

about such a plea, nor could he recall discussing the possibility of one with Rice.
(See 4/30/21 Hr'g Tr. 26:10-27:4, 67:22-68:2).  Rice admits he bases his estimation
such a plea "was likely attainable" solely on "conjecture."  (See Doc. 182 at 19 &
n.8).  The government seizes upon Rice's concession, suggesting it is fatal to his
claim.  (See Doc. 188 at 36 (citing, *inter alia*, Jacobs v. United States, No. 15-4826,
2017 WL 4082564, at *11 (D.N.J. Sept. 15, 2017), cert. of appealability denied, No. 18-
2300, 2018 WL 6584965 (3d Cir. Sept. 27, 2018)).  We agree with the government's
assessment.

Rule 11 of the Federal Rules of Criminal Procedure authorizes defendants—
with the consent of the government and the court—to enter a guilty plea expressly
reserving their right to seek appellate review of specific adverse determinations on
pretrial motions, and to withdraw their plea if they prevail on appeal.  See FED. R.
CRIM. P. 11(a)(2); see also United States v. Zudick, 523 F.2d 848, 851-52 (3d Cir. 1975)
(endorsing use of conditional pleas "in appropriate circumstances").  But neither
Rule 11 nor the Constitution creates an "enforceable 'right' to enter a conditional
plea."  See United States v. Daniel, 866 F.2d 749, 751 (5th Cir. 1989) (quoting United
States v. Fisher, 772 F.2d 371, 374 (7th Cir. 1985)).  Rice proffers nothing more than
speculation that the government would have consented to a conditional plea or that
he would have accepted its hypothetical demands in exchange for one.  See Fisher,
772 F.2d at 374 (noting prosecutors would have "extract[ed] a price" before
conceding defendant's right to appeal denial of suppression motion).

Moreover, our court of appeals considered Rice's challenge to our orders
denying suppression and rejected it on its merits.  See Rice, 716 F. App'x at 123.

Just as "[c]ounsel cannot be deemed ineffective for failing to raise a meritless

claim," <u>see</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 203 (3d Cir. 2000) (citation omitted), it

stands to reason counsel does not transgress the Sixth Amendment by failing to

negotiate a conditional plea agreement that preserves the same fruitless issues for

appellate review, <u>see</u> <u>Jacobs</u>, 2017 WL 4082564, at *11.  Any conditional appeal on

the grounds Rice raised "would have failed" regardless; thus, he cannot prove

prejudice under <u>Strickland</u>.  <u>See</u> <u>United States v. Andrews</u>, 38 F. App'x 824, 827 (3d

Cir. 2002) (nonprecedential).

### D.      Ground 4: Unreasonable Prognosis About Trial Odds

Rice laments forgoing a "non-trial disposition" and blames Attorney

Caraciolo's "unreasonable prognosis" of prevailing at trial.  (<u>See</u> Doc. 182 at 19-22.)

The government offered Rice three separate plea agreements with slightly different

terms.  (<u>See</u> Def. Exs. 3-5.  Each agreement would have required Rice to plead

guilty to distributing child pornography (Count Two), and identified a sentencing

range between five and 20 years, the statutory mandatory minimum and maximum

terms for that offense, respectively.  (<u>See</u> <u>id.</u> ¶¶ 1-2).  The first two plea offers

contained direct appeal waivers and contemplated a three-level reduction for

acceptance of responsibility.  (<u>See</u> Def. Ex. 3 ¶¶ 11, 29; Def. Ex. 4 ¶¶ 12, 30).  The

second offer was virtually identical to the first save for the addition of a paragraph

providing "the U.S. Army will withdraw and dismiss all Charges and Specifications

filed against" Rice in exchange for his guilty plea to Count Two.  (<u>See</u> Def. Ex. 4 ¶ 5).

The third offer contained none of those provisions.  It limited Rice to a two-level

reduction for acceptance of responsibility and recommended a four-level

enhancement using the penultimate tier of the United States Sentencing Guidelines' image table (300 to 600 images).  (See Def. Ex. 5 ¶¶ 11-12).

Attorney Caraciolo recalled "almost always" conveying each plea offer to Rice in person at his law office; he recounted Rice "would always take the battery out of his phone when [they] met because . . . he didn't like to have these types of conversations with a phone available."  (See 4/30/21 Hr'g Tr. 13:11-14:11, 19:9-13, 20:3-21, 28:18-29:1).  Counsel highlighted the mandatory minimum term and discussed the applicable sentencing guidelines, which he estimated would be about seven to 10 years in Rice's case.  (See id. at 14:12-15:11, 47:17-21, 49:8-14).  He advised Rice the second agreement's court-martial proviso probably was illusory because "[t]he military never agreed to sign" the document or to be bound by its terms.  (See id. at 18:17-19:22, 20:22-21:10; see also id. at 65:1-66:9).  They also discussed the pros and cons of going to trial, including the possibility Rice might receive a harsher sentence.  (See id. at 21:11-21, 47:22-51:6).

Rice rejected the first two plea offers for a few reasons: he had not yet filed suppression motions, he did not want to register as a sex offender, he was unwilling to give up his appellate rights—a dealbreaker in his view—and no one knew the repercussions for his military case.  (See id. at 21:22-22:6, 51:7-53:4; 5/14/21 Hr'g Tr. 23:19-24:1, 25:9-26:7, 28:12-16, 31:25-32:4, 55:21-56:22).  The third plea offer arrived after we denied Rice's motions, as the defense was reevaluating its position in light of our rulings.  (See 4/30/21 Hr'g Tr. 23:19-24:4, 27:5-12).  Attorney Caraciolo recognized having to contend with digital evidence made winning at trial more difficult, and he told Rice conviction was a real possibility, but they "had a lot of

faith" in Dr. Mercuri and forged ahead with the strategy of "pointing the finger at"
Rice-Goldie.  (See id. at 24:5-25:18, 26:1-9, 30:7-31:12, 54:15-55:1, 68:7-25).  Counsel
did not believe the latest offer was in Rice's best interests either.  (See id. at 53:5-20,
67:14-21).  "[O]ne of the major sticking points" was that "the military wouldn't
commit to dropping anything."  (See id. at 29:22-30:6; see also id. at 53:21-54:4. 66:10-
67:13).  Rice agreed and rejected the third offer.  (See id. at 54:5-10).

     Dr. Mercuri was key to Rice's defense.  Rice personally sought out and
recruited Dr. Mercuri, relied heavily on her opinion, and expected her to produce a
demonstration video of how Rice-Goldie could have manipulated his laptop
remotely—a critical piece of anticipated defense evidence.  (See id. at 55:2-56:23;
5/14/21 Hr'g Tr. 53:11-54:6).  Dr. Mercuri's inability to actually produce such a video
became clear on the eve of trial.  At that juncture, Attorney Caraciolo was skeptical
of her persuasive value and advised Rice he might be "better off taking a plea."
(See 4/30/21 Hr'g Tr. 56:23-57:19, 69:11-70:19; see also 5/14/21 Hr'g Tr. 58:16-59:5).
Rice disregarded counsel's recommendation and hired Cunningham as a second
expert.  (See 4/30/21 Hr'g Tr. 57:20-58:15).  The government held the option of a plea
deal open "pretty much up to trial," but the parties' negotiations did not result in
another offer.  (See id. at 25:19-24; 5/14/21 Hr'g Tr. 57:2-22).

     Rice disputed some aspects of Attorney Caraciolo's testimony.  He claimed
counsel discussed the first two plea offers by phone for just a few minutes, did not
provide a physical copy of any offer, and never reviewed the applicable sentencing
guidelines.  (See 5/14/21 Hr'g Tr. 22:3-25:8, 26:8-19, 27:19-28:11, 39:2-19).  Rice was
under the impression each offer was for a flat five-year sentence.  (See id. at 26:20-

27:18, 40:7-41:5).  He rejected the third agreement because he did not believe the difference between five and seven years—counsel's estimation of a post-trial sentence—was worth giving up his appellate rights.  (See id. at 29:23-30:13, 31:14-18, 32:5-9).  Rice claimed Attorney Goldberger told him his true sentencing exposure "might be double digits," and if he had known sooner, he would have accepted a deal for a five-year sentence that preserved his appellate rights.  (See id. at 30:14-31:4, 33:24-34:3, 41:6-18).  Rice conceded under cross-examination that pleading guilty almost certainly meant a court-martial conviction as well, with cascading effects like dishonorable discharge, loss of veterans' and medical benefits, and forfeiture of his military pension, valued at more than $1 million.  (See id. at 45:15-48:4).  He knew prevailing at trial would be difficult, but he relied heavily on Dr. Mercuri's opinion in deciding to go forward.  (See id. at 53:8-54:9).

We have good reason to discount Rice's self-serving testimony given his documented history of deceit, but he doomed his latest salvo against trial counsel's stewardship by failing to materially contest counsel's averments.  Attorney Caraciolo testified credibly that he kept Rice abreast of significant developments in the case and how they might affect his chances at trial.  (See, e.g., 4/30/21 Hr'g Tr. 23:19-24:4, 57:8-21).  Those odds shifted against Rice after we denied his motions to suppress his laptop and related materials, and again when Dr. Mercuri failed to produce a demonstration video for use at trial.  (See id.)  Rice did not heed Attorney Caraciolo's eminently reasonable advice that he might be better off pleading at that point because conviction was a "real possibility," (see id. at 54:15-55:1, 57:8-21)—guidance Rice does not contradict.  Rice understood the difficulty of his position

and still chose to proceed on the strength of his handpicked experts' opinions, as was his right.  (See 5/14/21 Hr'g Tr. 53:8-54:9).  We do not fault counsel for his client's misplaced confidence.

Nor are we persuaded Rice probably would have pled guilty if "properly counseled."  (See Doc. 182 at 22).  Rice had everything to lose with a conviction in this case, including his military career and lucrative retirement benefits.  (See 5/14/21 Hr'g Tr. 44:16-18, 46:7-48:15).  He did not want to go to prison or register as a sex offender.  (See id. at 48:16-23).  Rice might be willing to accept a five-year sentence now given how things turned out, (see id. at 33:24-34:3, 41:6-18), but five years was always his statutory *floor*, not his ceiling.  Rice also made clear any deal that barred an appeal of our suppression orders was a nonstarter.  (See id. at 41:6-18, 55:21-56:8).  None of the government's plea offers would have satisfied his preconditions because they did not expressly preserve his appellate rights in that respect.  See Lefkowitz v. Newsome, 420 U.S. 283, 288 (1975) (citations omitted) (discussing "general rule that a guilty plea . . . bars the later assertion of constitutional challenges to [] pretrial proceedings"); see also Tollett v. Henderson, 411 U.S. 258, 267 (1973); United States v. Porter, 933 F.3d 226, 229-31 (3d Cir. 2019) (collecting cases); United States v. Moskow, 588 F.2d 882, 886-87 (3d Cir. 1978) (quoting Zudick, 523 F.2d at 852).  Rice's admissions alone are fatal to his argument.

In any event, to succeed on this ground, Rice must show his "conviction or sentence . . . would have been less severe" under an unrequited offer "than under the judgment and sentence that in fact were imposed."  See Lafler v. Cooper, 566 U.S. 156, 164 (2012).  This he cannot do.  Each offer required Rice to plead guilty to

Count Two, the sole charge for which he was punished.  Rice's actual sentence of 142 months (with a two-month adjustment for time served) was well below both his Guidelines sentence of 240 months, (see Doc. 118 ¶ 59), and the estimated range (235 to 240 months) he might have faced had he accepted the government's third plea offer with all its inducements, (see Def. Ex. 5).  It is true the third deal recommended a two-level reduction for acceptance of responsibility (Rice got none) and only a four-level enhancement based on the number of images involved (as opposed to the five levels he received without objection for possessing more than 600), but those slight deviations would not have affected our decision to vary Rice's sentence downward to twelve years.  That sentence was appropriate because it accounted for Rice's risk of recidivism and fell in line with, if not slightly below, the median sentence in comparable child pornography cases, thus avoiding unwarranted disparities with similarly situated offenders.  (See Doc. 128, 12/28/16 Sentencing Tr. 12:9-14, 30:11-33:24).  Rice's sentence was significantly less severe than what he might have faced under the government's offers; therefore "[t]he record conclusively shows that [he] was not prejudiced by proceeding to trial."  See United States v. Armstrong, 799 F. App'x 116, 119 (3d Cir. 2020) (nonprecedential).

### E.    Ground 5: Inadequate Advice About Sentencing Exposure

Rice's fifth ground—that he went to trial unaware of "the double-digit range he was facing," (see Doc. 182 at 24)—fails for the same reason as his fourth.  Even if Attorney Caraciolo gave Rice bad advice about his sentencing exposure, there is no reasonable probability Rice would have received a less severe sentence by pleading guilty instead of going to trial.  See Lafler, 566 U.S. at 164.

### F.      Ground 6: Double Jeopardy

Lastly, Rice asserts trial and post-trial counsel were ineffective for failing to raise a double-jeopardy challenge to Count Two based upon his now-vacated military sentence.  (See Doc. 182 at 25-28).  The parties did not probe the circumstances surrounding that forfeited constitutional challenge at all during the evidentiary hearing.  Attorney Caraciolo separately averred that his representation ended before Rice confronted "a perfected Double Jeopardy issue."  (See Def. Ex. 2 ¶ 6).  Rice does not challenge trial counsel's recollection, so we have no basis to assign responsibility for this decision to him.  Attorney Goldberger, on the other hand, submitted an affidavit in which he explained he "saw no non-frivolous basis" for challenging Count Two just because a military judge potentially considered the images Rice was convicted of distributing from January 23 through January 28, 2013, as related conduct when fashioning an aggravated sentence.  (See Doc. 161 at 7-9).

Rice's claim fails for at least two reasons.  As a threshold matter, Rice's distribution offenses here and at his court-martial were not "the same in law *and* in fact."  See United States v. Finley, 726 F.3d 483, 495 (3d Cir. 2013) (citing United States v. Felton, 753 F.2d 276, 278 (3d Cir. 1985)).  The Double Jeopardy Clause of the Fifth Amendment affords three distinct constitutional protections.  See North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  The clause prohibits (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense."  Id. (citations omitted).  Only the third of these safeguards is at issue.  The

jury convicted Rice at Count Two of receiving and distributing child pornography

from January 23 through January 28, 2013, based upon his Yahoo! chat logs.  (See

Doc. 84 at 1-2).  His court-martial plea, by contrast, covered six unrelated images he

distributed between November 30 and December 6, 2010.  See Rice, 80 M.J. at 38-39.

There is no factual or temporal overlap between these offenses, and Rice cites no

authority for the proposition that a court may not consider related conduct

punished elsewhere when arriving at a just sentence.

More fundamentally, though, Rice faces no risk of double punishment

because he "stands convicted of no military offenses."  See Rice, 2020 WL 6256712,

at *2.  Whatever merit, if any, his claims might have held when this court sentenced

him in December 2016, he cannot establish prejudice today because he no longer is

subject to any other punishment by any other court for distributing child

pornography.  Thus, Rice's resort to the Double Jeopardy Clause is unavailing.

**IV.** **Conclusion**

For these reasons, we will deny Rice's motion.  We will also deny a certificate

of appealability, because Rice has not "made a substantial showing of the denial of a

constitutional right."  See 28 U.S.C. § 2253(c)(2).  An appropriate order will issue.


/S/ Christopher C. Conner
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    June 22, 2023